```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                         HAMMOND DIVISION


WILLIAM QUARLES, JR., VANESSA    )
JONES, and WILLIAM QUARLES, SR.  )
                                 )
          Plaintiffs             )
                                 )
     v.                          )   Case No. 2:04 cv 22
                                 )
THE CITY OF GARY, INDIANA, a     )
Municipal Corporation; CITY OF   )
GARY POLICE OFFICERS DAVID       )
THOMAS SAVIOLA, MARCUS HARRIS,   )
BRIDGEMAN whose first name is    )
unknown at this time; BERT       )
SANDERS, GIVEN whose first name  )
is unknown at this time; and     )
certain other members of the     )
Gary, Indiana Police Department  )
whose names are unknown at this  )
time, in both their official     )
and personal capacities,         )
                                 )
          Defendants             )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the defendants, The City of Gary, et al., on July 28, 2005. For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART.**

Background

On November 17, 2001, William Quarles, Jr., was shot by City of Gary police officer David Saviola. According to the defendants,[1] Officers Jarrett Bridgeman and Irving Givens were conducting a traffic stop at approximately 4460 Massachusetts Street

---

[1] The defendants have failed to attach exhibits 2, 8, and 9 to their reply brief in support of summary judgment, and these exhibits were not duplicated as attachments in the opening and response briefs. Thus, the court does not consider them here.

in Gary, between 5:09 and 5:15 P.M., when they heard between five and seven gunshots fired southeast and extremely close to their location.  (Jarrett Bridgeman November 17, 2001 Voluntary Statement ("VS"), p. 1; Irving Givens November 18, 2001 VS, p. 1) Officer Bridgeman ran south on Massachusetts Street towards 45th Street, the first east-west cross street, where a man advised him that the shots came from inside Snuzzo's Bar on the corner of 45th and Massachusetts.  (Bridgeman VS, p. 1) Officer Givens ran east, through an alley between Massachusetts and Connecticut Streets, and to the front of 4486 Connecticut Street, which was the second house on the west side of Connecticut Street, north of 45th Street.  (Givens VS, p. 2) It also was where Williams Quarles, Jr. lived with his mother, Vanessa Jones.  (Vanessa Jones Dep. p. 5)

   While standing west of the door to Snuzzo's, Bridgeman alleges that he "saw the muzzle flash and heard the report of a gunshot from in between the garage of 4486 Connecticut and the garage south of there."  (Bridgeman VS, p. 2) Givens also heard the shots and took cover on the north side of 4486 Connecticut Street.  (Givens VS, p. 2) Bridgeman took cover behind a vehicle in front of Snuzzo's and returned two shots, which Givens heard. Bridgeman then saw someone run eastbound between the garages, and Givens looked around the corner of 4486 Connecticut Street, where he first stated that he heard, and later testified that he saw, a screen door closing and the inside back door shut.  (Bridgeman VS, p. 2; Givens VS, p. 2; Givens November 17, 2001 Statement,

2

Bates Stamped 20) Givens stayed at the rear of the house until Bridgeman and other units responded, including Officers Burt Sanders, David Saviola, and Marcus Harris.  (Givens VS, p. 2; Burt Sanders November 18, 2001 VS, p. 2; Arrest Report completed by David Saviola, p. 1; Marcus Harris Affidavit).  All of the responding officers were black except Saviola, who is white.

    Bridgeman knocked on the front door of 4486 Connecticut Street with his baton and heard one person yelling that the police were not coming in without a warrant, while another person said that he could not open the front door but would open the back door for the police.  (Bridgeman VS, p. 2; Givens VS, p. 2) Givens then shined his flashlight on the back door where he saw Raymond Willis come out of the house and saw Quarles, Jr. appear behind him.  Givens ordered Willis and Quarles, Jr. to come down the concrete stoop and keep their hands visible.  Willis complied and was handcuffed on the ground without incident.  (Givens VS, p. 2; Arrest Report, p. 1)

    Quarles, Jr.'s arrest occurred slightly differently according to each witness officer.  According to Givens' November 17, 2001 report, he witnessed Quarles, Jr. refusing to place his hands in the air and then saw Saviola walk past Givens and attempt to secure Quarles, Jr. as he was resisting arrest. (Givens Statement, Bates Stamped 20) However, according to Givens' November 18, 2001 VS, Givens glanced over to his left as he was securing Willis to see Saviola struggling with Quarles, Jr. on the stairs.  (Givens VS, p. 2) According to Sanders,

Quarles, Jr. was refusing to come out of the house as Saviola took hold of him by the shirt and attempted to pull him out.  A struggle between Saviola and Quarles, Jr. ended when a shot was fired and then both men "came down the stairs."  (Sanders VS, p. 2) Bridgeman states that he saw Quarles, Jr. refusing to come outside, "cursing and swearing at officers," and swinging his arms as Saviola reached for him, which caused Saviola to lose his balance and discharge his weapon as he was falling down the stairs.  (Bridgeman Statement, Bates Stamped 9-10; Bridgeman VS, p. 2)

    Finally, according to Saviola's Arrest Report for the incident, Quarles, Jr. would briefly raise his hands before lowering them again, and although he complied with the commands to lay down on the ground, he still did not keep his hands in plain view.  Saviola then attempted physically to move Quarles, Jr. by the neck of his t-shirt, but Quarles, Jr. grabbed Saviola's right hand (holding the gun) with his left hand.  A struggle ensued, and Saviola's gun accidentally discharged, shooting Quarles, Jr. in the back.  (Arrest Report, p. 2) It is not clear whether Saviola's gun discharged as Saviola was attempting to pull Quarles, Jr. up from the ground or whether Quarles, Jr. was standing at the time of the gunshot.  It also is not clear whether Saviola was facing Quarles, Jr. on the stoop or reaching over the railing to grab his shirt when his gun discharged.  (Saviola Dep. pp. 89-90; Arrest Report, p. 2) An investigation by the Lake County Prosecutor subsequently concluded that the

4

gunshot was accidental and the result of a struggle between Saviola and Quarles, Jr.  (Letter from Prosecutor, Bates Stamped 1)

After the police called the Gary Fire Department Ambulance for Quarles, Jr. and placed Willis in the squad car, Harris, Bridgeman, Givens, and Sanders searched the house for other suspects.  (Givens VS, p. 3; Bridgeman VS, p. 2; Sanders VS, p. 2) Givens previously had been told by Willis that no other people were in the house.  (Givens VS, p. 3) During the search, Givens noticed a weapon and holster in plain view on top of other items in a trash can.  (Givens VS, pp. 3, 5)

According to the plaintiffs, Willis came to visit Quarles, Jr. around 5:00 P.M. on November 17, 2001.  Quarles, Jr. was on the telephone, so Willis went to the basement to set up a video game and then joined Quarles, Jr. in the kitchen, where he was cooking.  (Willis Aff. ∂1; Quarles, Jr. Aff. ∂1) Approximately 10 minutes later, Quarles, Jr. and Willis got down on the floor when they heard shots nearby, and then resumed talking for 10 to 15 minutes when they heard the police banging on the front door. (Willis Aff. ∂2; Quarles, Jr. Aff. ∂1) Quarles, Jr. told the police that he could not open the front door because his mother kept the key to the deadbolt, but he showed his I.D. through the storm door and told the police to come around the back.  Willis asked if the police had a warrant.  Willis then came out the back door with his hands up and was taken down to the ground.  Quarles, Jr. followed approximately 30 seconds later, with his hands

5

up and his wallet I.D. in his right hand.  He walked two or three steps out onto the porch and was shot in his upper left back.  (Willis Aff. ∂3; Quarles, Jr. Aff. ∂1) According to Willis, Givens came into the backyard and asked him what happened as Willis was being walked to the police car.  (Willis Aff. ∂4)

As a result of the shooting, Quarles, Jr. suffered damage to his kidney, spleen, lung, and nerves.  An operative report from Methodist Hospital does not state the trajectory of the bullet, but it states that Quarles, Jr. had a gunshot wound to his "left chest and abdomen."  (Operative Report, p. 1) No other medical or forensic evidence has been provided.

To counter Bridgeman's testimony, the plaintiffs have produced a photo and affidavit in support of their contention that from a vantage point west of the door to Snuzzo's, a six-foot fence blocked the view of the garage at Quarles, Jr.'s home.  Jones also has provided numerous photos of the destruction of her home she alleges occurred during the police search.  According to her, the police "emptied the contents of drawers on the floors; took mattresses off the beds; tore open covers of couches, cushions, pillows; tore pictures off the walls; tore down ceiling tile; tore up carpeting and completely ransacked my house." (Jones Response to Interrogatory #7)

The police did not have a warrant for the arrest of Quarles, Jr. and Willis or a search warrant for 4486 Connecticut.  In addition, the plaintiffs state, and the defendants do not dispute, that three months after being discharged from the hospital,

6

Quarles, Jr. was arrested and charged with resisting arrest and battery on a police officer. On October 29, 2004, all charges were dismissed by the Lake County Superior Court, which also granted a protective order for Quarles, Jr. against the Gary Police. Neither state court order has been provided to this court.

On January 14, 2004, Quarles, Jr., his father, William Quarles, Sr., and his mother, Vanessa Jones, filed suit against the City of Gary and Officers Saviola, Harris, Bridgeman, and Sanders in their personal and official capacities, alleging (1) unreasonable search and seizure/false arrest in violation of the Fourth Amendment of the United States and Indiana Constitutions; (2) racial discrimination in violation of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. ßß1982 and 1983, and various state laws; (3) invasion of privacy; (4) excessive force; and (5) wrongful imprisonment. Quarles, Sr. also asserts a claim for loss of support and services of his son.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); ***Lawrence v. Kenosha County***, 391 F.3d 837, 841 (7th Cir. 2004); ***Branham v. Snow***, 392 F.3d 896, 901 (7th Cir. 2004); ***Windle v. City of Marion, Indiana***, 321 F.3d 658, 660-61 (7th Cir. 2003),

*cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*, 391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party

opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)

*See also*, ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); ***Celotex Corp.***, 477 U.S. at 322-323, 106 S.Ct. at 2553; ***Branham***, 392 F.3d at 901; ***Lawrence***, 391 F.3d at 841; ***Hottenroth***, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); ***Schuster v. Lucent Technologies, Inc.***, 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

As a preliminary matter, the claims properly before the court on summary judgment must be clarified. First, the defendants do not address Quarles, Sr.'s claim at all, and so it

9

survives summary judgment.  Second, the plaintiffs clearly have asserted claims under Indiana law, but the defendants do not address the state law basis for any of the plaintiffs' claims beyond a cursory acknowledgment.  Accordingly, these claims remain pending.

The plaintiffs' federal law claims for excessive force and wrongful imprisonment also remain pending.  The defendants have not addressed wrongful imprisonment at all.  As for excessive force, the defendants' briefing focuses generally on probable cause for search and seizure, with no attention to the reasonableness of the force used to obtain Quarles, Jr.'s arrest, despite the plaintiffs' separate treatment of the issue in their response brief.  While the court applies the same "reasonableness" standard to seizures and excessive force claims, the reasonableness of a seizure is distinct from the reasonableness of the amount of force used to effectuate the seizure and must be considered separately.  *See* ***Lawrence v. Kenosha County***, 391 F.3d 837, 842-43 (7th Cir. 2004).

In any event, the facts most favorable to the plaintiffs show that Quarles, Jr. took two or three steps out of the house unarmed and with his hands up before being shot in the back by Saviola.  While the defendants rely upon the officers' version of what transpired, weighing the credibility of witnesses is the responsibility of the trier of fact.  ***United States v. Bianucci***, 416 F.3d 651, 655 (7th Cir. 2005).  The considerable differences between the plaintiffs' and defendants' versions of what tran-

10

spired create a genuine issue of material fact on the issue of excessive force.  Thus, the only issues fully briefed on summary judgment are the plaintiffs' claims for unreasonable search and seizure under the Fourth Amendment and for racial discrimination under 42 U.S.C. ß1983.

Pursuant to the Fourth Amendment, "a warrantless arrest by a law officer is reasonable . . . where there is probable cause to believe that a criminal offense has been or is being committed." ***Devenpeck v. Alford***, 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004).  Probable cause, in turn, exists if "at the time of the arrest, the officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing, a crime." ***United States v. Briet***, 429 F.3d 725, 728 (7th Cir. 2005).  *See also* ***United States v. Parra***, 402 F.3d 752, 764 (7th Cir. 2005).  Probable cause is based on the "totality of the facts and circumstances known to a reasonable arresting officer. . . ." ***Nichols v. Town of Cedar Lake***, 131 Fed. Appx. 488, 490 (7th Cir. 2005).  Consequently, the court evaluates probable cause "on the facts as they would have appeared to a reasonable person in the position of the arresting officer-seeing what he saw, hearing what he heard." ***Parra***, 402 F.3d at 764 (*quoting* ***Mahoney v. Kersery***, 976 F.2d 1054, 1057 (7th Cir. 1992)) (emphasis omitted).

Taking the facts most favorable to the plaintiffs, Bridgeman did not see the gunfire coming from near the garage at 4486

11

Connecticut, nor did he see a suspect run between the two residences because his view was obstructed.  However, he heard the gunfire from that general vicinity, returned fire, and ran towards 4486 Connecticut.  Givens, who was positioned on the north side of 4486 Connecticut, either heard or saw the screen door and back door of 4486 Connecticut slam shut.  Even if Givens was present at the front of the house some point after other officers responded and prior to Quarles, Jr. being shot, as Willis' affidavit suggests, this location is not inconsistent with Givens' previous ability to observe or hear the doors shut.  Based on the location of the shots and Givens' testimony, probable cause to arrest is evident.[2]

However, probable cause to search is an issue for the jury in this case.  A warrantless search of Jones' and Quarles, Jr.'s residence "is presumptively unreasonable under the fourth amendment, absent exigent circumstances or certain other exceptions." *United States v. Collins*, 110 Fed. Appx. 701, 703 (7th Cir. 2004), *cert. denied*, ___ U.S. ___, 125 S.Ct. 1352, 161 L.Ed.2d 146 (2005).  *See also* **Kirk v. Louisiana**, 536 U.S. 635, 637, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002) Under the exigent circumstances doctrine, "a warrantless entry may be legal when there is compelling need for official action and no time to secure a warrant," such as when the police are in hot pursuit of a felon or seek to prevent the imminent destruction of evidence.

---

[2] The defendants have not provided the legal basis for the arrest, but the court notes that discharge of a firearm within city limits must violate some local ordinance or state law.

12

*Collins*, 110 Fed. Appx. at 703.  However, even when exigent circumstances exist, the search must be "limited to the circumstances that justified it."  *Collins*, 110 Fed. Appx. at 705 (*quoting* *United States v. Salava*, 978 F.2d 320, 324 (7th Cir. 1992)).  *See also* *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2005 WL 3038664 (U.S. Dec. 12, 2005) ("[A] search for drugs, unlike a self-protective look-see, requires consent or a warrant.").

A "protective sweep," by contrast, is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers and others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990).  *See also* *Leaf v. Shelnutt*, 400 F.3d 1070, 1086-87 (7th Cir. 2005).  To search beyond those limits, there must be "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Leaf*, 400 F.3d at 1086 (*quoting* *Buie*, 494 U.S. at 334, 110 S.Ct. at 1098).

While the defendants had the right to conduct a protective sweep of 4486 Connecticut, they did not have the right to search the premises under the facts of this case.  The only rationale offered by the defendants for entering the residence was to

13

discover if other individuals remained inside.  The defendants are silent on the nature of their activities within the house and offer no evidence on the condition in which they found the residence.  By contrast, the plaintiffs have provided unrebutted evidence in the form of photographs, deposition testimony, and answers to interrogatories that the residence was severely damaged by the police.  If true, this evidence shows that the officers conducted an extensive search of the property.

The defendants' argument that Jones cannot assert a claim for damages to her home because she has not presented evidence on the pre-search condition of the residence is misplaced.  *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).  In *Heft*, the plaintiff claimed that the police destroyed her personal property during the search of her home, but she provided no evidence of the pre-search condition or post-search destruction beyond her own vague allegation of harm.  *See* 351 F.3d at 282.  Conversely, the police testified that her house was "cluttered and disorderly" prior to the search, although they admitted to moving some belongings during the search.  *See Heft*, 351 F.3d at 282-83.  Here, the plaintiffs have provided far more evidence than the defendants (who have provided none) that some form of search occurred.  However, the plaintiffs have not supplied evidence on the pre-search condition of the residence beyond an unsupported statement that they "maintained their home in an immaculate manner."  (Response Brief, p. 14) Nevertheless, the evidence that

14

they *did* provide prevents this court from determining as a matter of law that a search, if it occurred, was reasonable.

Finally, the plaintiffs' racial discrimination claims must fail.  The plaintiffs provide no legal basis for these claims, and the facts cited in support of them consist of the observation that Saviola is white whereas Jones and Quarles, Jr. are black.  It is firmly established that "[a] plaintiff alleging an Equal Protection violation under ß1983 must establish that she has been the victim of intentional discrimination. . . ."  *Harper v. Madison Metropolitan School District*, 110 Fed. Appx. 684, 687 (7th Cir. 2004).  The fact that the plaintiffs and Saviola were different races hardly is evidence of intentional discrimination.  Moreover, the plaintiffs' attempts to take Saviola's deposition testimony out of context are not well taken.  While Saviola confirmed that he has been called a "cracker" and "whop" in the course of his work, he also stated that it does not bother him.  (Saviola Dep. pp. 197-98)

The plaintiffs contend that Saviola was not properly trained because his deposition testimony allegedly suggests that he did not know how his gun worked.  Further, the deposition testimony does not "suggest," as the plaintiffs argue, that Saviola believed "that the gun could 'cock' itself and fire itself without him pulling the trigger."  (Response Brief, p. 9) In actuality, Saviola testified that he was unsure what effect having the hammer back prior to firing ñ- versus not having the hammer back prior to firing ñ- would have on the gun's discharge, but that he

15

believed there would be less pressure on the trigger with the hammer cocked.  (Saviola Dep. pp. 150-51) He also discussed being trained on some of the factors unique to the Beretta, such as how jarring of the slide can put the hammer back.  (Saviola Dep. p. 152) Saviola's misconstrued deposition, particularly without any other evidence of a racially discriminatory policy or practice, does not suffice to raise the inference of a Section 1983 violation by either Saviola or the City of Gary.

In sum, the following claims remain in this case by virtue of the lack of briefing: (1) Quarles, Sr.'s claim for loss and support of services; (2) all Indiana law-based claims; (3) excessive force; and (4) wrongful imprisonment.  Genuine issues of material fact also preclude summary judgment on the plaintiffs' claim for unreasonable search.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the defendants, The City of Gary, et al., on July 28, 2005 is **GRANTED IN PART** and **DENIED IN PART.**

ENTERED this 5th day of January, 2006

                                            s/ ANDREW P. RODOVICH
                                              United States Magistrate Judge